IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LETITIA ROMERO,

        Plaintiff,

v.                                                  CIV 05-0346 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

## **MEMORANDUM OPINION AND ORDER**

      Plaintiff Letitia Romero[1] filed for benefits in October 2002. She was thirty-seven years old at the time. She claimed that she became disabled in February 2001, the date she last worked as a waitress, due to fibromyalgia, auto-immune disease, and disc disease of the cervical spine. Later, she included depression as a disabling condition. *E.g., Administrative Record* (hereinafter "*Record*") at 51, 108, 112, 332, 334. Following a hearing, Administrative Law Judge ("ALJ") Gerald R. Cole found that Plaintiff had no severe impairments and denied benefits at Step 2. *See id.* at 21-26. The Appeals Council considered a questionnaire from a treating mental health source that was executed after the ALJ issued his decision, and declined review on March 18, 2005. *See id.* at 5, 8, 344-45, 347-48.

      This matter is before the Court on Plaintiff's motion to reverse or remand, where she asserts that the ALJ committed five errors. *Docs. 8, 9.* Pursuant to 28 U.S.C. § 636(c) and FED.

---

[1] She is also referred to as Letitita Griego in parts of the record. *See, e.g., Administrative Record* at 107, 277.

R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. *See Docs. 3, 5.* The entire record has been carefully read and considered, and I find the Step 2 analysis issues concerning fibromyalgia and depression dispositive. Because those issues have consequences for the remaining allegations of error, I remand the matter to the Commissioner for further proceedings.

## I.  Medical Evidence Concerning Fibromyalgia And Depression

Plaintiff's medical records show that she complained of head pain in 2000.[2] Neurologist Dr. Mark Berger believed that an abnormal MRI result was a "single abnormal signal," possibly related to a migraine, because further tests had ruled out multiple sclerosis. *Id.* at 136; *see also id.* at 143. He was of the opinion that Plaintiff's head pain was "mixed migraine/tension headaches," and wanted Plaintiff to continue with her medications and consider a psychological evaluation for stress reduction. *Id.*

In February 2001, among other things, Plaintiff also began to complain of shoulder pain, depression, and fatigue to her primary care physician, Dr. Roland K. Sanchez. *See id.* at 256-59.[3]

---

[2] *See Record* at 197-99 (01/25/00 – UNM emergency room visit for face and neck pain for three weeks worsening after Lidocaine injection; diagnosed with a tension headache, possible migraine; given medication and instructions to follow up with primary or neurologist); *id.* at 140-41 (10/02/00 – Los Lunas Family Practice referral forms for MRI and to neurologist Dr. Mark Berger); *id.* at 327 (10/03/00 – Presbyterian Magnetic Resonance Imaging Center results of MRI of brain; "abnormal focus of high signal seen within the left periventricular white matter having a perpendicular orientation to the ventricles. This would be worrisome for a Dawson's finger or multiple sclerosis. Would recommend conducting the appropriate lab values for further evaluation. Vasculitis would also be the differential."); *id.* at 139 (10/09/00 – Los Lunas Family Practice medical record; summary page from lab tests for "multiple sclerosis profile").

[3] *See also id.* at 298 (record of Plaintiff call to Valencia Counseling Services, Inc. crisis line a few weeks earlier, crying, talking fast, and discussing her health problems "at length . . . was overwhelmed w/these issues.").

In the year that followed, Dr. Sanchez referred Plaintiff to several specialists for these symptoms.

During the first few months of this period, emergency room doctors, also unsure of the reason for the symptoms, advised Plaintiff to avoid "repetitive use" injuries at work, attend stress management counseling, and follow through with an MRI that was already scheduled. During that period a mild cervical spine bulge also was discovered, as well as a uterine fibroid tumors that were removed. Plaintiff had written "doctor excuses" to be off work for several weeks. *See, e.g., id.* at 150-51, 188-90, 193, 195-96, 231-34, 253-54, 244-50, 272.

As for the shoulder pain, Dr. Sanchez thought Plaintiff had "thoracic outlet syndrome." *Id.* at 243-44. Thoracic surgeon Dr. T. Philip Jacob disagreed – his May 2001 report states that he was "not convinced that she has thoracic outlet syndrome" and was "unable to find a reason for her symptoms." *Id.* at 143-45. Evidently, he in fact discovered Plaintiff holding her arms up rigidly for a "considerable length of time" causing her veins to protrude. *Id.* at 144. After Dr. Jacob's report, Dr. Sanchez referred Plaintiff to a neurologist for "thoracic outlet syndrome." *Id.* at 237; *see also id.* at 234.

Neurologist Dr. Manuel A. Gurule examined Plaintiff in July 2001. His impression was that Plaintiff "has bilateral upper extremity paresthesias which have a definite positional component. The possibility of carpal tunnel syndrome exists." *Id.* at 186. He recommended EMG and nerve conduction studies to evaluate the possibility of carpal tunnel syndrome. If she did not have that condition, he "felt that she warrants evaluation by a rheumatologist for possible joint disorder and/or autoimmune disease." *Id.*

For reasons not evident from the record, Plaintiff apparently did not have the carpal tunnel studies performed. During the next six months, she did request refills for her medications and

work release notes from Dr. Sanchez.  She also visited the neurology clinic once in December 2001.  *See id.* at 184, 230-32.  In mid-January 2002, Plaintiff saw Dr. Sanchez to discuss a "referral."  Lab results showed positive ANA values and the ferritin was slightly low.  *Id.* at 227.  He diagnosed her with arthritis in wrists and shoulders, degenerative disc disease of the cervical spine and other things that are illegible.  *Id.* at 226.  He referred Plaintiff to rheumatologist, but she did not see one until months later for unknown reasons.  *Id.* at 229.

Instead, the next day, Dr. Sanchez's physician assistant wrote a "to whom it may concern" letter, stating that Plaintiff is disabled due to thoracic outlet syndrome.  *Id.* at 225. Plaintiff did not show for her appointment with Dr. Sanchez the following week.  *Id.* at 224.

Approximately six weeks later, Plaintiff was admitted to the Presbyterian psychiatric ward for depression.  Her son had become concerned when he discovered his mother had shot a bullet through the ceiling and was locked in her room.  She claimed the gun went off accidentally when she was checking to make sure it was not loaded.  Nevertheless, he took Plaintiff to the emergency room.  She was assessed a GAF of 50 on admission and a GAF of 65 upon discharge seven days later.  While hospitalized, she told the doctors that a vascular surgeon and neurologist had referred her to an orthopedic surgeon, who was probably doing to operate on her neck.  This assertion does not accurately reflect her visits to Drs. Berger, Jacob, and Gurule, and there are no other records of a visit to an orthopedic surgeon in the file.  These notes also indicate that Plaintiff admitted she abuses methamphetamine.  *See id.* at 157-181, 296-97.

On May 6, 2002, Plaintiff evidently visited the Social Security office and provided the information contained in her applications.  *See, e.g., id.* at 51, 332 (computer generated date of 5/6/02 as header to each page).  She mentioned she had learned that as of June 1, 2002, she

would no longer be receiving $300 a month in AFDC benefits or medicaid coverage. *Id.* at 332A. She did not, however, submit the applications at that time. The next day, she returned to see Dr. Sanchez, complaining of numbness on her right side and pain. Though she had not yet seen a rheumatologist per the records in the file, Dr. Sanchez diagnosed her with autoimmune disease, chronic pain, and fibromyalgia. *Id*. at 220. He referred Plaintiff to Brian Delahoussaye for pain management. *Id.* at 223. However, there are no records that reflect Plaintiff followed up with this referral either.

Approximately ten weeks later, in July 2002, Plaintiff visited an outpatient clinic. The record of the July 2002 visit is illegible for the most part, but the diagnosis lists "** FM" in the diagnosis section. It also contemplated a rheumatology consult. *Id.* at 183. A later record refers to this visit as concluding "it was felt that she most likely had fibromyalgia, although we wanted to rule out any possible rheumatic conditions." *Id.* at 153 (the reference to the prior visit as occurring in July 200<u>3,</u> rather than July 200<u>2</u>, is an evident typographical error).

Plaintiff did not see a rheumatologist until six months later. In the interim, she filed her applications for benefits through Social Security. At some point, she also evidently began the process of applying for General Assistance benefits based on disability. *See id.* at 131 (duplicated at 307).

On January 10, 2003, Dr. Arthur Bankhurst, Professor of Medicine, Director of Rheumatic Diseases & Clinical Immunology Division at the University of New Mexico, examined Plaintiff. His "Impression" was "Fibromyalgia – at this point in time, the patient does not meet the criteria of a classic autoimmune diseases such as rheumatoid arthritis or systemic lupus erythematosus." *Id.* at 154. He recommended that Plaintiff continue aerobic exercise as

5

tolerated, improve her sleep hygiene, and take antidepressants and muscle relaxers. *Id.* Plaintiff would later be awarded General Assistance benefits based on disability as of January 16, 2003. It is not clear from the record whether the January 16th date has any relationship to Dr. Bankhurst's diagnosis. *See id.* at 131.

After the Administration initially denied benefits in February 2003, Plaintiff again visited Dr. Sanchez in late March and early April 2003. *See id.* at 156, 260-73, 334-35. Her subjective complaints at these visits are illegible, but his notes indicate that Plaintiff "wants SSI," *id.* at 217, and wanted him fill out a form for "disability," *id.* at 214. His primary diagnosis was fibromyalgia, and he again referred her to Brian Delahoussaye for pain management for the condition. *Id.* at 217-18. He also referred Plaintiff to Valencia Counseling Services, Inc. *Id.* at 219.

Plaintiff was to return to see Dr. Sanchez as needed. *See id.* at 214. But there are no other records from Dr. Sanchez other than a questionnaire he filled out that indicated Plaintiff was unable to do any sort of work "pending further treatment and evaluation." *Id.* at 213. Who or what provided the questionnaire to him is unclear. Dr Sanchez indicated that Plaintiff: "never" can lift or carry even five pounds; "never" can use either hand for repetitive simple grasping or fine manipulation; "never" can bend, squat, crawl, climb, or reach, and; is "total[ly] restricted from heights, moving machinery, marked changes in temperature and humidity, driving, or exposure to dust, etc. *Id.* at 211-12.

There are no records indicating that Plaintiff ever saw the pain management specialist. Six weeks after her claim was denied on reconsideration, however, she did begin counseling. *See id.* at 339-40, 282-83. From July 2003 until the January 2004 hearing, Plaintiff regularly went for

counseling. *See id.* at 278-84, 306, 309-17, 321-26. Beginning in November, she also began going to First Choice Community Healthcare, where she received "trigger point injections" for "myofascial pain." *Id.* at 300-03, 328-29, 331, 365-66, 374.

After the ALJ issued his decision, Plaintiff's counsel submitted a questionnaire executed by Glenna Giles "APN" of Valencia Counseling Services, Inc., in October 2004. Again, the source of the questionnaire is not clear. Her responses indicate that Plaintiff attended counseling from March to July 2004 (in other words before the ALJ issued his decision), that she met certain aspects of Listing § 12.04, and that she had "marked" restrictions of in certain areas. *See id.* at 344-48. Since this evidence qualifies as "new," "material," "relevant," and the Appeals Council "considered" it in reaching its decision, this questionnaire "becomes part of the record we assess in evaluating the Commissioner's denial of benefits under the substantial-evidence standard." *Chambers v. Barnhart,* 389 F.3d 1139, 1442-43 (10th Cir. 2004) (and cases cited therein).

## II.  Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and Plaintiff is not entitled to relief. *E.g., Langley v. Barnhart,* 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin,* 365 F.3d at 1214; *Doyal,* 331 F.3d at 760. An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record of if there is a mere scintilla of evidence supporting it." *Langley,* 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin,* 365

F.3d at 1214.  My assessment is based on a "meticulous" review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency.  *Hamlin,* 365 F.3d at 1214; *see also Langley,* 373 F.3d at 1118.

### III.  Analysis

This case must be remanded because ALJ Cole did not apply the correct legal standard in his Step 2 analysis, nor is his decision supported by substantial evidence.  As ALJ Cole recognized, at Step 2, a claimant establishes a "severe" impairment if she shows that a "medically determinable" impairment has "more than a minimal effect" and "significantly" interferes with "basic work activities," such as walking, standing, sitting, ability to follow instructions, and use of judgment.  He also recognized that the evaluation is made on the basis of medical evidence alone, and that a claimant's own testimony or report of symptoms will not suffice.  *See id.* at 22-23; *see also, e.g.,* 20 C.F.R. §§ 404.1508, 404.1520(a)(4)(ii), 404.1520(c), 404.1521, 404.1527, 404.1528.

However, ALJ Cole spent the bulk of his discussion explaining why he did not find Plaintiff's allegations of her limitations credible.  But that is not the focus, or determinative, of the Step 2 analysis.  His opinion wholly ignored the medical evidence indicating that Plaintiff suffers from fibromyalgia.  In fact, fibromyalgia is not discussed at all.  He also ignored the counseling records from Valencia regarding her depression concerning her physical condition, except for minute portions of those records that either show Plaintiff abused methamphetamines or can be cited as an example where Plaintiff was not truthful.  When ALJ Cole did discuss the medical evidence, he mentioned only what the doctors had ruled out: Dr. Jacob ruled out thoracic outlet syndrome, Dr. Bankhurst ruled out autoimmune disorders, and when Plaintiff was discharged

from the seven-day in-patient psychiatric treatment for the episode with the gun, her prognosis was good. "It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Hardman v. Barnhart,* 362 F.3d 676, 680 (10th Cir. 2004).

In addition, the only record of Dr. Sanchez that the ALJ discusses is the questionnaire, which the ALJ dismisses as "brief, conclusory, and unsupported by the medical evidence and because it is based on only four treatment visits." *Record* at 24. Since the questionnaire is a form calling for brief answers and checking boxes, the characterization of "brief" and "conclusory" is not supportable. Moreover, his observation that Dr. Sanchez only saw Plaintiff four times would appear to be an obvious mistake on Dr. Sanchez's part, given his actual records that appear in the file. Finally, the ALJ's characterization that Dr. Sanchez's questionnaire is "unsupported by the medical evidence" appears to be based the ALJ's discussion of the medical evidence, which itself was incomplete.

The absence of any discussion of the fibromyalgia diagnosis in the medical records, coupled with the ALJ's conclusion that her "subjective complaints are not established by medical evidence consisting of objective signs, symptoms, and laboratory findings," convinces me of the "ALJ's fundamental misperception of the nature of fibromyalgia." *Moore v. Barnhart,* 114 F3ed. Appx. 983, 991 (10th Cir. 2004). Fibromyalgia is a condition for which there are no "objective" or "laboratory" findings. It is error for an ALJ to dismiss the condition as nonsevere at Step 2 on this basis alone, particularly where the medical evidence of the diagnosis was ignored. *See id.* (and authorities cited therein); *Gabaldon v. Barnhart,* ___ F. Supp. 2d ___, 2005 WL 3027689 at \*\* 9-10 (D.N.M. 2005); *see also Garza v. Barnhart,* 397 F.3d 1087, 1089 (8th Cir. 2005); *Green-*

9

*Younger v. Barnhart,* 335 F.3d 99, 106-08 (2nd Cir. 2003); *compare Roybal v. Barnhart,* CIV 02-760 KBM (Doc. 20). And, as the Tenth Circuit recently observed:

> the ALJ's decision does not indicate that he considered the cumulative effect of claimant's impairments. At step two, the ALJ must 'consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.' 20 C.F.R. § 404.1523. If the claimant's combined impairments are medically severe, the Commissioner must consider 'the combined impact of the impairments . . . throughout the disability determination process.' *Id.* The record shows that claimant suffered from joint disease or fibromyalgia, as well as chronic fatigue, migraines or chronic headaches, depression, and reflux disorder. The ALJ was required to assess the combined impact of these impairments to determine the effect, if any, they had on plaintiff's ability to do work-related activities. His failure to do so requires reversal of the decision."

*Langley,* 373 F.3d at 1123-24.

On last error, the record contains evidence that Plaintiff did receive General Assistance based on a disability, but ALJ Cole did not mention that evidence. The Tenth Circuit has held that "[a]lthough findings by other agencies are not binding on the [Commissioner], they are entitled to weight and must be considered." *Baca v. Dep't of Health & Human Servs.,* 5 F.3d 476, 480 (10th Cir. 1993) (internal quotation marks omitted). Recently, the Tenth Circuit assumed, "without deciding, that the holding in *Baca* applies to findings by state agencies." *Hackett v. Barnhart,* 395 F.3d 1168, 1172 (10th Cir. 2005).

The Commissioner posits reasons why, after reviewing all of the medical records in detail, the ALJ's Step 2 decision should be sustained. Regardless of the merits of those arguments, I cannot supply reasons for the ALJ when he has not undertaken the proper analysis in the first instance. Since the case must be remanded at the Step 2 level, I need not consider Plaintiff's

other arguments at this juncture.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion *(Doc. 8)* is granted and the matter is remanded to the Commissioner for further proceedings. A final order will enter concurrently herewith.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

11